UNITED STATES *v.* RADIO CORP. OF AMERICA, RCA VICTOR DIVISION (No. 4779)[1]

United States Court of Customs and Patent Appeals, November 2, 1953

*Warren E. Burger*, Assistant Attorney General (*Richard H. Welsh* and *Arthur R. Martoccia*, special attorneys, of counsel), for the United States.

*Sharretts, Paley & Carter* (*Joseph F. Donohue* and *Howard Clare Carter* of counsel) for appellee.

[Oral argument October 7, 1953, by Mr. Welsh and Mr. Donohue]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment entered by the Second Division of the United States Customs Court in conformity with its decision, Abstract 57238, 30 Cust. Ct. 406, sustaining the protest at the importer, appellee here, whereby it seeks recovery of a portion of the duties assessed and collected by the Collector of Customs at the port of New York, New York, upon certain paper coverings having, as imported, phonographic records or disks therein. Printed matter on the coverings indicated the character of the merchandise which the coverings contained and a circular hole about 2 or 3 inches in diameter enabled an observer to see the name of the production recorded on the disk.

In the collector's "Memorandum re Protest" it was said that the appraiser's description, made in conformity with the statute and

[1] C. A. D. 541.

regulations, was accepted and adopted in liquidation "and the merchandise was accordingly classified as envelopes of paper, N. S. P. F., printed, at 35% under paragraphs 1408 and 1409 of the Tariff Act of 1930 and/or T. D. 51802."

T. D. 51802 (82 Treas. Dec. 304) announces the General Agreement on Tariffs and Trade proclaimed by the President of the United States December 10, 1947.[1]

The General Agreement on Tariffs and Trade modified both paragraphs 1408 and 1409 of the Tariff Act of 1930, which the collector invoked and, as modified, the phraseology here pertinent reads:

Par. 1408. * * * Paper envelopes, filled or unfilled, whether the contents are dutiable or free, not specially provided for shall be subject to the same rate of duty as the paper from which made and in addition thereto, if * * * printed * * * 5 [10 as originally enacted] per centum ad valorem * * * *Provided*, that paper envelopes which contain merchandise subject to an ad valorem rate of duty * * * shall be dutiable at the rate applicable to their contents but not less than the rates provided for herein.

Par. 1409. * * * paper not specially provided for 30 per centum ad valorem.

The rates upon several of the kinds of paper provided for in paragraph 1409 were modified in both trade agreements but there was no change of those originally fixed (30% ad valorem) upon "wrapping paper" and "paper not specially provided for."

The pertinent phraseology of paragraph 1542 as modified by both trade agreements reads:

Phonographs, * * * and parts[2] thereof not specially provided for 15 [30 as originally enacted] per centum ad valorem * * *.

By reason of the classification of the articles as printed paper envelopes under paragraph 1408, *supra*, the collector, obviously regarding them as having been made from the kind of paper covered by the last clause in paragraph 1409, *supra*, applied the unmodified 30% rate provided in that clause and, in addition, assessed the modified rate of 5% provided by the trade agreement in paragraph 1408, *supra*, and, although the first portion of the proviso to paragraph 1408 provides that envelopes which contain merchandise subject to an ad valorem rate shall be dutiable at the same rate as that merchandise and although the merchandise (parts of phonographs) contained in the articles here involved, as imported, was by reason of the modification of the original rate of 30% fixed in paragraph 1542, *supra*, subject to a duty of only 15% ad valorem, that first portion was nullified in the case of paper envelope containers by the last clause of the proviso

---

[1] It appears that in all respects here material T. D. 51802 is identical with T. D. 49753 (74 Treas. Dec. 253), proclaimed November 25, 1938, which embodies the Trade Agreement with the United Kingdom. Since the collector cited T. D. 51802 our references will be made to it.

[2] Phonographic records apparently have been consistently treated as parts of phonographs ever since the decision of this court affirming that of the Board of United States General Appraisers (now the United States Customs Court), which had sustained the collector's classification of such merchandise, in the case of *American Express Co.* v. *United States* that arose under the 1909 tariff act.

reading "but not less than the rates provided for herein," the word "herein" being regarded as applying to the act as a whole or at least to its paper schedule.

So, the total duty levy imposed by the collector in liquidation was 35 per centum ad valorem.

The claim made in importer's protest reads:

We claim that said articles (paper containers) are the usual containers of phonograph or gramophone records customarily used for covering and transporting them. Said records and their containers are entireties, and are dutiable at only 15% ad valorem under par. 1542 as amended by the General Agreement on Tariffs and Trade.

We further claim that the assessment of duties made herein is illegal and void.

It should be understood at the outset and kept steadily in mind throughout the discussion that the fundamental question to be determined here is whether the paper articles which were imported with phonographic records in them were paper envelopes within the purview of paragraph 1408 of the Tariff Act of 1930 (19 U. S. C. sec. 1001, par. 1408) which is the only paragraph in the act that designates paper envelopes *eo nomine*.

If the articles are held to have been paper envelopes within the meaning of paragraph 1408, *supra*, the collector's classification and duty assessment were correct and the judgment appealed from must be reversed. On the other hand, if they be held not to have been such envelopes, but usual containers of phonographic records or disks, they had no separate tariff status and the judgment should be affirmed.

At the trial by the Customs Court the record in the case of *R. C. A. Victor Div., Radio Corp. of America* v. *United States*, C. D. 1317, 26 Cust. Ct. 154, was incorporated into the record of the instant case upon motion of counsel for the importer, counsel for the Government consenting. The issues there seem to have been identical with those involved here, and both cases were tried by the same division of the Customs Court. The decision was favorable to the importer. No testimony nor any other evidence was there introduced on behalf of the Government, nor was any appeal taken from the trial court's judgment and apparently the only reason that the doctrine of *res judicata* is not here applicable is that the goods here involved were imported in a different shipment and covered by a different entry.

In that case the testimony of four witnesses was introduced in evidence by counsel for the importer, along with two exhibits. In the instant case one of those witnesses testified again and another witness, called by the importer, testified in rebuttal. The testimony of two witnesses and one exhibit was introduced in the instant case on behalf of the Government.

It is deemed appropriate to refer briefly to the tariff history re-

specting paper envelopes before discussing the evidence, and, in this connection, to consider relevant dictionary definitions of the term "envelope." Most, if not all, of the judicial decisions apropos were cited and fairly analyzed in the decision of the trial court.

The general tariff act of March 3, 1883, contained an *eo nomine* provision for paper envelopes in an unnumbered paragraph of Schedule M reading: "Paper envelopes, twenty-five per centum ad valorem."

In the act of October 1, 1890, the duty was made specific in paragraph 421 reading: "Paper envelopes, twenty-five cents per thousand." Paragraph 425 of that act also contained the following provision:

Manufactures of paper, or of which paper is the component material of chief value, not specially provided for in this act, twenty five per centum ad valorem.

. While the 1890 act was in effect there was an importation of paper articles which resulted in the first litigation having a direct bearing upon the subject matter here present. *Meyer & Co.* v. *United States*, T. D. 12788, G. A. 1384, Synopsis of Decisions 12,261 to 13,002, Vol. I, p. 585.

In its decision of the case the Board of United States General Appraisers (now the United States Customs Court) described the merchandise as:

* * * colored paper bags or envelopes about 16 inches in length by 11 inches in width, with an open space about 8 inches long and 5 inches wide in one surface, for the purpose of displaying the contents, and are ornamental upon one side with embossed and gilted designs. They bear the inscription, in gilt letters, "Embroidered trimmings all in one length" and are intended to be used especially for holding and exhibiting embroideries.

It is deduced from the decision that the articles as imported had no contents. So, no question of their being ordinary containers was involved.

The collector classified the merchandise as manufactures of paper, not specially provided for, under paragraph 425 of the 1890 act, and the importer claimed under the *eo nomine* provision for envelopes in paragraph 421.

The board (now the court) sustained the collector's classification, saying *inter alia:*

* * * Although known in the embroidery trade as embroidery covers or envelopes, they are not designed for, nor could they be put to, any of the uses for which the envelopes of commerce are intended to be employed; that is to say, for covering and holding letters, documents, etc., for transmission through the mails, and do not, in our opinion, belong to the class of articles intended to be covered by the provision for "paper envelopes" in paragraph 421 of the present [1890] tariff act.

It was further stated as findings of fact:

(1) That the goods in question are composed of paper, are especially designed for use in holding and exhibiting embroideries, and bear upon one surface a printed inscription showing that they are intended for that specific use only.

(2) That they are not the articles commonly known in trade as envelopes.

It would appear that the board (now the court), without expressly so stating, applied there the doctrine of use as against an *eo nomine* provision.

The board's decision in that case was rendered April 19, 1892, while the 1890 act was in force, and no appeal was taken.

The tariff act of August 27, 1894 (the "Wilson-Gorman Act") reverted to the ad valorem duty rate in paragraph 309 thereof, reading: "Paper envelopes, twenty per centum ad valorem." The act contained no change in language growing out of the board's decision in the *Meyer & Co.* case, *supra.*

(Incidentally it may be said that the ad valorem plan respecting paper envelopes seems to have been followed in all subsequent tariff acts, but provision has been made in different of the acts for both specific and ad valorem duties on some types of paper.)

We find no record of any litigation respecting paper envelopes under the 1894 act.

Paragraph 399 of the ("Dingley") tariff act of July 24, 1897, read: "Paper envelopes, plain, twenty per centum ad valorem; if bordered, embossed, printed, tinted, or decorated, thirty five per centum ad valorem." There was also a paragraph (407) for manufactures of paper precisely similar to paragraph 425 of the 1890 act, *supra*, except that the rate was fixed at 35 per centum ad valorem.

In a case which arose under the 1897 act, an importation of merchandise described as "bag like covers for photographs made of imitation parchment paper" and having printed matter thereon, imported by Hensel, Bruckmann & Lorbacher, was held by the Board of United States General Appraisers (now the United States Customs Court) in an abstract decision rendered June 16, 1908, to be properly classifiable under paragraph 407, *supra*, it being expressly stated: "It is apparent from the record in these cases that the articles are not envelopes as that term is generally understood or as it is defined in the Standard Dictionary." See T. D. 19180, 15 Treas. Dec. 637.

This holding, which was cited in the decision of the trial court in the instant case, was in accord with the principle announced in the *Meyer & Co.* case,[3] *supra*, the imported articles being excluded from the *eo nomine* paragraph for paper envelopes.

The earliest edition of Funk & Wagnalls New Standard Dictionary readily available to us is that of 1925. It sets forth various definitions of envelopes, only two of which seem to have any relevancy here:

(1) A case or wrapper, usually of paper, with gummed edges for sealing in which a letter or the like may be sent through the mail or enclosed for safety.

---

[3] Evidently the importer claimed under the first clause of paragraph 399 because in the board's opinion it said:

* * * In any event the photograph covers here in question if dutiable as claimed under the provisions of paragraph 399, would not be dutiable at 20 per cent, the rate sought for by the importer, but rather at 35 per cent as printed envelopes.

(2) Any enclosing integument or covering; a wrapper.

An 1897 edition of a "New English Dictionary on Historical Principles" (Oxford) also gives definitions of the term, illustrating them with references to and quotations from literary works of different periods. Two of the definitions read:

(1) That in which anything is enveloped; a wrapper, integument, covering.
(2) The cover of a letter; now a small sheet of paper folded and gummed to serve as a cover for a letter.

The pertinent definition in the 1932 edition of Webster's New International Dictionary reads:

(1) That which envelops; a wrapper; an inclosing cover; esp., the cover or wrapper of a document, as of a letter.

This authority gives "to surround entirely" as one definition of "envelope" when the term is used as a verb.

In a 1911 edition of the Century Dictionary, "envelope," also spelled "envelop," is given noun definitions as follows:

(1) A wrapper; an inclosing cover; an integument; as the *envelope* of seed. [Italics quoted]. Specifically, (2) a prepared wrapper for a letter or other paper, so made that it can be sealed.

Two definitions when used as a verb are "(1) To cover, as by wrapping or folding; inwrap; invest with or as a covering; surround entirely; cover on all sides. 2. To form a covering about; lie around and conceal."

In the ("Payne-Aldrich") tariff act of August 5, 1909, paragraph 414 read: "Paper envelopes not specially provided for in this section, folded or flat,[4] if plain, twenty per centum ad valorem; if bordered, embossed, printed, tinted, decorated, or lined, thirty-five per centum ad valorem." Paragraph 420 of that act relating to manufactures of paper was identical with paragraph 407 of the 1897 act, *supra*.

We have found no record of any litigation involving the dutiable status of paper envelopes under the 1909 act.

Paragraph 327 of the ("Underwood") tariff act of 1913 read: "Paper envelopes, folded or flat,[4] not specially provided for in this section, 15 per centum ad valorem," and paragraph 332 contained a clause which read: "* * * all papers and manufactures of paper or of which paper is the component material of chief value, not specially provided for in this section, 25 per centum ad valorem."

In paragraph 325 of the 1913 act provision was made for "* * * articles composed wholly or in chief value of paper, lithographically printed * * * not exceeding eight one thousandths of an inch in thickness, 15 cents per pound."

The construction placed upon that provision in the 1913 act appears

---

[4] The Funk & Wagnalls Dictionary defines a "flat envelope" as a paper cut so as to form an envelope when folded."

in a ruling by the Assistant Secretary of the Treasury relative to the "classification of lithographic containers in the form of envelopes," which was cited in the decision of the trial court in the instant case. It appeared in the form of a letter dated April 29, 1922, addressed to the Collector of Customs, New York, and was published as T. D. 39102 in 15 Treas. Dec. page 273. The Assistant Secretary cited the decision of the Board of General Appraisers in the *Meyer Co.* case, *supra*, and said, *inter alia:*

Following the reasoning of the board in the decision cited, the department is of the opinion that lithographic containers which are used for holding articles, such as ladies' hair nets and other articles of merchandise, are not dutiable under the provision in paragraph 327 of the tariff act of October 3, 1913, for paper envelopes, but are properly dutiable as articles lithographically printed under paragraph 325 of the said act, and you are accordingly directed to assess duty upon these lithographic containers under paragraph 325 of the tariff act. * * *.

The articles there involved apparently were imported without any contents.

In the case of *United States* v. *Graser-Rothe Co. et al.*, 11 Ct. Cust. Appls. 493, T. D. 39631, 43 Treas. Dec. 445, this court affirmed the judgment of the Board of General Appraisers (now the Customs Court), holding certain containers for phonographic disks classifiable and dutiable under paragraph 327 of the 1913 act as claimed by the importer, thus overruling the collector's classification under para-graph 332 of the act.

In this court's decision the merchandise was described as "* * * [a] flat paper article and might be denominated a paper bag were it not for the fact that a circular piece is cut out of the center." It was also said there:

The testimony in the case is uncontradicted and was sufficient to establish that the merchandise was definitely, uniformly, and generally, and not partially, locally, or personally bought and sold in the trade as record envelopes.

In view of the fact that the articles were flat, it is supposed that they were of paper cut to form an envelope when folded, and that, in that respect, they differed from the articles here involved which had phonographic records in them when imported.

In that case the Board of United States General Appraisers (now the United States Customs Court) stated in Abstract 45262, 42 Treas. Dec. 362:

From the evidence it was found that the merchandise in question is commer-cially known and recognized as a "record envelope" and was so designated on and prior to October 3, 1913. It has, therefore, been held classifiable under the provision for paper envelopes in paragraph 327 as claimed.

It will be observed from the paragraph above quoted from the court's decision that the phraseology used was that customarily

employed [5] in decisions which hold that "commercial designation" as distinguished from common meaning, is established by satisfactory evidence, and in the instant case the trial court held that "it was made abundantly clear that the [Graser-Rothe] case turned upon the question of commercial designation."

Upon this point the brief on behalf of the Government states, *inter alia:*

* * * It appears, however, from an analysis of that decision, that there was no conflict between the common and commercial meanings of the term "envelopes." There was no showing in that case as to what the common meaning of the term "envelope" was, and by the same token, there was no showing what the commercial meaning was, and wherein was the difference. It might well be that the commercial and common meanings of the term "envelope" were the same. * * *.

This argument is made by the Government, of course, upon the theory that the *Graser-Rothe Co.* decision constitutes a potent precedent in support of the Government's position here, if it be found that it was decided upon the basis of the common meaning of the term "envelope."

In the *Graser-Rothe* case counsel for the Government apparently were contending that the merchandise was properly classified by the collector under the provision in paragraph 332 of the 1913 act for "manufactures of paper not specially provided for," and that it did not fall within the *eo nomine* designation "paper envelopes," in paragraph 327 of that act. Here, doubtless because of statutory changes and judicial decisions, it is being contended for the Government that the *eo nomine* provision in paragraph 1408 of the 1930 act should prevail with the addition of the duty provided in paragraph 1409 for "paper not specially provided for."

With respect to the statement in the brief for the Government to the effect that no showing was made in the *Graser-Rothe* case, *supra,* relative to the difference between the common and commercial meanings of the term "envelopes," it seems sufficient to say that this court's decision in that case was rendered May 7, 1923 and the record in the case was not introduced in evidence in the instant case. We are not, therefore, at liberty to retry it, but must be bound by the findings of fact there made which, as hereinbefore has been said, were stated in practically the exact phraseology used by the Supreme Court in stating what must be shown to establish "commercial designation" in its legal and technical sense.

The trial court said:

It needs no protracted discussion of the rules of commercial designation for the conclusion that implicit in a holding that there is a general, uniform, and definite

---

[5] In the case of *Maddock* v. *Magone*, 152 U. S. 368, 371, the Supreme Court (after citing and quoting from the case of *Cadwalader* v. *Zeh*, 151 U. S. 171, 176) said:

Necessarily the commercial designation is the result of established usage in commerce and trade, and such usage, to affect a general enactment, must be definite, uniform, and general, and not partial, local, or personal.

commercial meaning of a tariff term, is a finding that such meaning necessarily differs from the common meaning thereof. *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916; *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C. C. P. A. (Customs) 146, T. D. 48009; *Edward Brenner* v. *United States*, 23 C. C. P. A. (Customs) 190, T. D. 48030. Accordingly, the *Graser-Rothe Co.* case, *supra*, must be construed as standing for the proposition that paper containers of phonograph records of the kind here involved are not within the common meaning of the term "envelope."

While there is no presumption that commercial designation continues from one tariff act to another, common meaning, once judicially declared, is the binding law of the land until changed by the legislative department. *United States* v. *Jules Raunheim (Inc.) et al.*, 17 C. C. P. A. (Customs) 425, T. D. 43867.

It may be said that in the *Raunheim* case so cited, we cited decisions of this court in the cases of *United States* v. *Sheldon & Co.*, 5 Ct. Cust. Appls. 371, T. D. 34555, 26 Treas. Dec. 1015; *Knauth, Nachod & Kuhne* v. *United States*, 6 Ct. Cust. Appls. 128, T. D. 35389, 28 Treas. Dec. 758; *Draeger Shipping Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 418, T. D. 41341, 49 Treas. Dec. 205; and *Draeger Shipping Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 454, T. D. 42644, 53 Treas. Dec. 263.

We do not think the trial court erred in refusing to treat the decision in the *Graser-Rothe Co.* case, *supra*, as *stare decisis* with respect to the instant case.

No effort was made in the instant case to establish a commercial designation of paper envelopes different from the common meaning of the phrase, but two witnesses were called on behalf of the Government by whom, apparently, it was sought to show that the involved articles were of a kind commonly known as envelopes in trade and commerce.

The burden of overcoming the correctness of the collector's classification, of course, rested upon the importer and it relied upon the testimony and exhibits presented in the incorporated case, which hereinbefore has been alluded to, plus that of one of the three witnesses who was recalled in the instant case, and a witness called in rebuttal.

It is not deemed necessary to review their testimony in detail.

Mr. Eugene Forman, the witness who testified in both cases, had been associated with the appellee company for 35 years at the time of testifying in April, 1950. He was then in charge of the phonograph record section of the company and had been familiar with imported records for 25 years. He stated, in substance, that he had never imported records which were not enclosed in paper containers of the kind here involved; that he knew of no use for such containers other than to protect the records in them from dust, dirt, and scratching; and that the records were sometimes taken from the containers and placed in albums. On cross-examination, when testifying in the instant case, he was asked "Do you know what a record envelope is?" and he replied "There's some people that call this [the imported

article] a record envelope; *we* call it containers or sleeves." In answer to other questions, he stated it was called a record envelope by "the consumer mostly;" that he did not know whether some manufacturers called the articles "record envelopes;" and that he "had never had occasion to buy such articles in the United States."

A second witness called on behalf of the importer in the incorporated case was Mr. Stuart M. Andrews, President of P. L. Andrews Corp., described by him as "manufacturers, primarily of envelopes, specialty envelopes, specialty containers, calling ourselves a packaging container manufacturing company." At the time of testifying (in April, 1950) he had been associated with the corporation for 30 years. Such significance as attaches to his testimony may be discerned from the following two questions and answers on direct examination (he was not cross-examined):

Q. What are the distinguishing characteristics of an envelope within your experience? A. Our usual interpretation of an envelope is something that has a flap which can be turned over and sealed and completely enclose the contents. That we really term an envelope, which would make it suitable for mailing or sealing up merchandise, and things of that nature.

\* \* \* \* \* \* \*

Q. Is it or is it not, in your opinion, an envelope? A. I hardly feel qualified to answer that to give you the proper definition. The line of demarcation is very close between the two. I can only say we have always referred to them as sleeves and jackets. I stated before my interpretation and our interpretation of an envelope is something that will completely enclose and seal the contents, which cannot be done with an open top article like Collective Illustrative Exhibit 1. That is just experience, one man's experience answering that question.

The third witness examined on behalf of appellee was Mr. David Rothfield, manager of and buyer for a company in New York which, the witness said, sold hundreds of thousands of phonograph records during the course of a year, the overwhelming proportion of which was contained in coverings of the type here involved. He testified (April 12, 1950) that he had been familiar with such articles "25 to 30 years;" that he had seen them used "just to contain a record;" that "they are always referred to as sleeves, and sometimes jackets, but generally the term 'sleeve' is used;" that when a record is sold they put it, together with its container, into a "special envelope the trade uses to contain records \* \* \* a stock envelope purchased from different distributors;" that he applied the term "envelope" to the article with its container because it has a flap which, not being gummed, is "put over" and sealed with sticker tape; and that a good proportion of the trade "today" uses that particular kind of envelope.

The fourth witness examined on behalf of the importer was Mr. Jerry Schoenbaum who was President of Chesterfield Music Shop, Inc., located in downtown New York City. He testified the company sold only phonograph records, the sales being at retail, that

he had been familiar with the use of articles such as those involved for eleven years; that the articles are usually found around records, the records being shipped in them and sold with the containers around them; that after a customer has made a choice his selection, in its container, is enclosed in a paper bag which is sealed with imprinted tape; and that his company does a large volume of business in records, selling "close to two hundred thousand dollars [worth] a year, in volume."

This witness stated that he had never bought and sold articles of the kind reported, but the record is not clear as to whether he meant that he had never bought or sold just the paper articles without records in them. His contacts in the business, however, seem to have been extensive and we see no reason for questioning his qualifications to state, for whatever it may be worth, his knowledge of what the articles were called.

Both of the witnesses called on behalf of the Government were high officials of companies engaged in the manufacture of paper articles, including envelopes, and their testimony, like that of the witnesses called on behalf of appellee, was largely opinion evidence. They, as well as the witnesses for appellee, seem to have had extensive experience in their chosen fields of activity.

There is much in the testimony of both the Government witnesses which is in the nature of background and this need not be detailed.

The first called was Mr. Frank H. Sellars, Jr., who had been associated with United States Envelope Company of Springfield, Massachusetts, for about 42 years and was, at the time of testifying (Dec. 12, 1951), vice-president of the company in charge of all sales. In his earlier service he worked in the factory and helped in manufacturing envelopes. The company makes many different kinds of envelopes—the witness said "all kinds."

He was asked to define the term envelope and replied "That is rather a large order. Envelopes are containers from paper or other materials." He was then asked by counsel for the Government "Do some of them have flaps?" and he replied:

Some have flaps; some have two flaps; some have no flaps at all. It depends on the purpose for which the envelopes are made and used. If you want examples, I think the easiest way, of course, is to take the ordinary what we call commercial or mailing envelopes, which are the correspondents [sic] envelopes used in the trade, which are sealed or may be unsealed for postage sake.

The witness then referred to different kinds of envelopes, mentioning "outlook" envelopes (which are those that show the address through a hole in the side, some covered with transparent material and some having a hole punched in the face to let the address appear), "insurance policy" envelopes having an open front; "pass book" envelopes used by savings banks; and "payroll" envelopes "made for a special purpose."

The witness stated further:

\* \* \* Any envelope which has a flap can be mailed due to certain conditions that the post office set down. For instance, 2nd and 4th class matter are mailable, subject to certain restrictions as to printing and so forth and so on.

Two of the judges of the trial court asked in substance if the witness would say that Exhibit 1, which is representative of the merchandise involved, would be commonly known as an envelope, and he answered: *"In our company,* yes. \* \* \* And with *our* trade." (Italics supplied.)

In answer to another question he expressed the view that *he* would consider the merchandise involved "as being embraced in the common meaning of an envelope."

It will be noted from the italicized words that the witness limited use of the term "envelopes" as descriptive of the imported articles, to himself and his company. As stated in the brief for appellee before us, he testified on further direct examination (he was not cross-examined by counsel for appellee) that the articles were referred to *in the trade* by various terms, mentioning "envelopes," "sleeves," "bags," "jackets," "containers," and "holders."

As we understand the testimony of the witness, his company manufactured articles, like that involved, on envelope-making machines; not on bag-making machines, and it seemed to be his theory that this rendered them envelopes, not just ordinary containers.

The other witness examined for the Government was Mr. Frank J. Meyer, President and Treasurer of the Century Envelope Company of New York City, which, he stated, manufactures "about everything in the envelope line." Asked as to his duties, he said, "I am the general manager; I direct the manufacturing; design; machinery; take care of the production; finance and all that goes with the office." His association with his company began in 1933. Prior to that time he was associated with other companies. Altogether, it appears that his experience went back to 1912.

Much of the testimony of this witness related to exhibits, seemingly introduced for purposes of comparison, which do not appear to have any relevancy to the actual issue before us, but we understand his opinion, as expressed in his direct examination, to have been that the involved articles were envelopes. However, on cross-examination, he pronounced them record envelopes (which was the view expressed by Mr. Sellars), saying "We call them envelopes; record envelopes. \* \* \* That is what *we* call them. (Italics supplied.)

That was immediately followed by the query:

XQ. In the trade, have you ever heard them called anything else? A. There are other names that other manufacturers have for them possibly.

XQ. In selling those articles, even to record manufacturers, as you have testified, have they always been referred to as record envelopes? A. Some manufacturers call them other things; sleeves, holders, pockets.

On re-direct examination, the witness stated, in substance, that those "other manufacturers" spoken of began to call the articles by other names "when bag manufacturers started to make imitations of these by a bag process" and added, "I would say that was within the last ten years." He was testifying February 14, 1952. He said, in substance, that he wouldn't know about the situation "prior to 1940; 1935," but that there was no equipment (meaning, as we understand it, none for making the articles by a bag-making process) in existence in June, 1930 (when the Tariff Act of 1930 was enacted).

The following testimony appears in the re-direct examination:

RQ. Now, does the method of manufacture in the trade determine whether an article is an envelope or a bag? A. Yes.

Judge RAO: Not the finished product?

The Witness: The method of manufacture is what determines whether it is an envelope; if it is of envelope construction or bag construction.

The witness called for appellee in rebuttal was Mr. Frederick C. Losen who, at the time of testifying in February, 1952, was General Traffic Manager of the Equitable Paper Bag Company of Long Island, New York, and its subsidiary, the Orange Pulp and Paper Company of Orange, Texas. The business of the Equitable company and, it is assumed, of the subsidiary also, was stated by the witness to be "the manufacture of paper and the conversion of that paper into various paper articles * * * primarily paper bags; also envelopes." The witness stated that his company manufactured articles similar to those here involved but not by the same process; that is, not on the same kind of machine.

The major portion of his testimony related to an article introduced as appellee's Exhibit 4 during the cross-examination of the witness Meyer. It seems to have been introduced for purposes of comparison. Although the witness probably was familiar with the business of the companies with which he was connected and had had occasion to make some study of the subject matter of envelopes, etc., we do not find anything in his testimony that is particularly helpful in determining the issue before us.

We have taken note of the two cases of the R. C. A. Manufacturing Co. v. United States, one, Abstract 43308, reported in 4 Cust. Ct. 408, and the other, Abstract 45132 in 6 Cust. Ct. 495. These are cited in the brief before us on behalf of the Government. So far as we can determine from the abstract decisions, the merchandise consisted of articles made from lithographed paper which were held by the United States Customs Court to be classifiable under paragraph 1408 of the Tariff Act of 1930, and subject to duty under that paragraph and paragraph 1409. The tests of the decisions are not sufficiently elaborate as to the facts to enable a determination of all the elements which should be known before accepting them as binding precedents. There was no appeal in those cases and the decisions do not seem to

be in harmony with prior decisions which had been accepted as a guide in administrative practice, at least for a time.

We have noted also the cited decision of the Customs Court in the case of *F. A. Shallus & Co.* v. *United States*, 59 Treas. Dec. 951, T. D. 44826, in which there was a much more elaborate opinion than those in the *R. C. A. Manufacturing Co.* cases, *supra*.

The merchandise there invovled was different from that in the case now before us. The articles were designed for use as containers for small purchases such as notions, and were not used for protecting phonographic records. Evidently they were not imported with merchandise in them and so were not ordinary containers of imported merchandise which was sold as such to ultimate consumers.

The case was not appealed, and we do not undertake to say here how it might have been regarded by this court had it come before it, but the difference in the merchandise is such that we cannot accept it as controlling of the issue here. It arose under the Tariff Act of 1922, but was not decided until nearly a year after the passage of the Tariff Act of 1930. So there is no matter of legislative ratification of the judicial decision there made which decision does not seem to be in harmony with the early decision in the *Meyer & Co.* case, *supra*.

It is our view that the testimony and other evidence in the instant case, including the exhibits introduced as illustrative of the imported merchandise, is sufficient to establish the fact that the articles involved are ordinary and usual containers of imported phonographic records and as such do not fall within the *eo nomine* designation of paper envelopes for which provision is made in paragraph 1408, *supra*.

The evidence presented on behalf of the Government does not, in our opinion, overcome the *prima facie* case established by appellee. In the final analysis, the opinions given by the witnesses called on behalf of the Government appear to result from a consideration of the machines used in making the articles rather than upon the physical characteristics of the articles themselves. That basis for their conclusions is not regarded as sound. Furthermore, their conclusions that the involved articles are envelopes, or "record" envelopes seem to have been confined by them to the products of their companies, the admission having been made by them that other manufacturers and tradesmen had other and varied names for them.

It seems to us that the noun "envelope"—as popularly understood, implies an article fully capable of completely enclosing whatever may be put into it. One can think of many words that may be used in defining articles which only partially surround other articles, but "envelope" seems to be the only term which normally carries the implication of a complete cover, and a flap seems to be indispensable to its completion.

The involved articles do not have flaps. They do not completely enclose the phonographic record which they contain. Their function is more of a bag or "jacket" function than an envelope function.

The decision of the trial court appears to be in harmony with well considered decisions made from time to time ever since the levying of customs duty upon envelopes designated *eo nomine* began. We do not think the decision erroneous and the judgment appealed from is *affirmed*.